887 P.2d 572

STATE of Arizona, Appellee–Respondent,

v.

Kevin James CLARK, Appellant–
Petitioner.

Nos. 1 CA–CR 91–0673, 1
CA–CR 93–0533–PR.

Court of Appeals of Arizona,
Division 1, Department D.

May 12, 1994.

State's Petition for Review Denied *;
Appellant's Cross–Petition for Review
Denied; Appellant's Cross–Petition for
Review by Supreme Court Dismissed
as Moot Jan. 24, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Barbara A. Jarrett, Former Asst. Atty. Gen., Phoenix, for appellee.

Richard M. Romley, Maricopa County Atty. by Arthur M. Hazelton, Deputy County Atty., Phoenix, for respondent.

Law Offices of Martin, Hart & Fullerton by James R. Hart, II, Mesa, for appellant.

C. Kenneth Ray, II, Phoenix, for petitioner.

OPINION

McGREGOR, Judge.

I.

A jury found Kevin James Clark guilty of five class 2, dangerous offenses: attempted first-degree murder, kidnapping, first-degree burglary, and two counts of sexual assault. The charges stemmed from a brutal attack on a woman inside her Tempe apartment during the early morning of August 3, 1990. The trial judge imposed maximum sentences of 21 years on the attempted murder, kidnapping, and sexual assault convictions and ordered all sentences to be served consecutively. He imposed a presumptive sentence of 10.5 years on the first-degree burglary charge, to be served concurrently with the other sentences.

Clark filed a timely notice of appeal. He later filed a Rule 32 petition for post-conviction relief, which the trial court summarily dismissed. We consolidated Clark's petition for review from that dismissal with his direct appeal.

Clark raises a single issue on appeal: Did the trial court err in determining that deoxyribonucleic acid (DNA) identification evidence was admissible under the analysis of

* Martone, J., of the Supreme Court, voted to grant    the State's petition for review.

*Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923)?

## II.

Prior to trial, the State forwarded items of evidence and samples of Clark's blood and of the victim's blood to Cellmark Diagnostic Laboratories, Inc. (Cellmark) for DNA analysis. Cellmark determined that the victim's DNA matched DNA found on a glove and a scarf seized from Clark's apartment. Cellmark also concluded that Clark's DNA matched DNA found on the glove. At Clark's trial, a molecular geneticist testified regarding the probability of these matches occurring randomly. The witness quantified the chance that the DNA on the scarf was that of someone other than the victim as one in 87 million; the chance that the DNA on the glove was that of someone other than the victim as one in 6.9 million; and the chance that the other DNA found on the glove was that of someone other than Clark as one in 10 million.

■ While Clark's appeal was pending, the Arizona Supreme Court decided *State v. Bible,* 175 Ariz. 549, 858 P.2d 1152 (1993), *cert. denied sub nom., Bible v. Arizona,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). In *Bible,* the court held that the principles and theory underlying DNA testing and the criteria employed by Cellmark in declaring a match meet *Frye* standards. *Id.* 175 Ariz. at 577, 582, 858 P.2d at 1180, 1185. The supreme court also held, however, that Cellmark's random match probability calculations are not generally accepted in the scientific community and therefore are inadmissible under *Frye.* *Id.* at 585–86, 858 P.2d at 1188–89.

Under the holding of *Bible,* the trial judge erred by permitting the State to introduce Cellmark's calculations regarding the probability of a random match. The remaining inquiry for this court, as it was for the supreme court in *Bible,* is to determine whether the error was harmless. *Id.* at 588, 858 P.2d at 1191.

In *Bible,* the supreme court defined the standard for deciding whether admitting evidence of the probability of a random match of DNA is harmless:

> Error, be it constitutional or otherwise, is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict. *[State v.] Lundstrom,* 161 Ariz. [141] 150 & n. 11, 776 P.2d [1067] 1076 & n. 11 [(1989)]. "The inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana,* 508 U.S. ——, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *accord [State v.] McVay,* 127 Ariz. [450] 453, 622 P.2d [9] 14 [(1980)]. We must be confident beyond a reasonable doubt that the error had no influence on the jury's judgment.

*Id.* at 588, 858 P.2d at 1191.

■ In *Bible,* the supreme court concluded that admission of Cellmark's probability calculations constituted harmless error. Applying the test defined in *Bible,* we conclude that two material differences between this case and *Bible* prevent us from finding the error harmless.

The first material distinction between this trial and that involving Bible results from the difference in information the jury received about probability calculations. In considering whether the error that occurred in Bible's trial was harmless, the supreme court stressed that experts at trial hotly debated the validity of those calculations. *Id.* at 588, 858 P.2d at 1191. In *Bible,* the trial court did not determine the admissibility of the DNA evidence in a pre-trial hearing, but rather on the basis of trial testimony. *Id.* at 580–81, 858 P.2d at 1183–84. As a result, the jury in *Bible* heard a well-qualified defense expert explain in detail the perceived flaws in the process that led to Cellmark's probability calculations.

In contrast, the jury in this case heard no such testimony. The defense called no expert witness, so the jury heard no challenge to the validity of the probability calculations. Indeed, defense counsel barely challenged the scientific basis underlying the probability calculations during cross-examination, which

focused instead on perceived flaws in Cellmark's testing of the evidence. Therefore, we have no basis for concluding, as the supreme court did in *Bible*, "that the picture presented to the jury did not have the aura of infallibility surrounding an unchallenged scientific theory." *Id.* at 588, 858 P.2d at 1191.

The second major distinction between the two cases is that we cannot characterize the evidence of Clark's guilt as "far beyond overwhelming," as was true of the evidence against Bible. *Id.* at 589, 858 P.2d at 1192. As the dissent asserts, "there is sufficient independent and properly admitted evidence in the record to support the guilty verdict[.]" We agree that, if the test were whether sufficient evidence exists to support the verdict, we should affirm. In *Bible*, however, the supreme court explained that error in admitting DNA probability match evidence is harmless only if we can "say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *Id.* at 588, 858 P.2d at 1191. The court emphasized that "[i]f the evidence against [Bible] had been closely balanced, strong, *or even very strong,* we think it would be impossible to say beyond a reasonable doubt that the inadmissible DNA evidence did not affect the verdict." *Id.* at 588, 858 P.2d at 1191 (emphasis added). The court then went on to characterize the properly admitted evidence against Bible as "far beyond overwhelming evidence of guilt." *Id.* at 589, 858 P.2d at 1192. We agree with the dissent that the evidence against Clark, set out in the dissent, is very strong. We do not think, however, that it is so overwhelming or one-sided that the jury's guilty verdict was surely unattributable to hearing the powerful evidence of probability calculations.

The evidence provided some support for Clark's defense. During the investigation, the victim told detectives that she thought that the assailant was her neighbor. She testified that she had observed a man, who watched the victim and her daughter for "a minute or two," standing outside a nearby apartment watching as she and her daughter moved in several days before the assault. Clark admitted that he saw the victim when she moved in. Clark's roommate, John Albers, however, also testified at trial that he had seen the victim when she was unpacking some things from her vehicle around the time when she moved in. He testified that he greeted her, but that she did not acknowledge him. The victim was unable to identify the assailant from a pre-trial lineup that included both Clark and Albers, although at trial she identified Clark as the probable assailant.

During an initial search of the apartment Clark and Albers had shared, the police found some items of evidence, but did not recover the clothes the assailant wore during the attack. Albers testified that on the Monday or Tuesday after the assault, while Clark was in California, Albers moved many items from the apartment into Albers' new residence. A few days later, while Clark was still in California, the police executed a search warrant at the apartment and found a plastic bag in the middle of Clark's closet containing the clothes and shoes the assailant had worn during the attack.

The defense attempted to use this evidence linking Albers to the crime to convince the jury that the State had failed to prove Clark guilty beyond a reasonable doubt. Defense counsel also sought to defuse the DNA identification testimony by arguing that the testing process had been manipulated to obtain a positive identification of Clark. In rebuttal, the State emphasized the reliability of Cellmark's analysis and reminded the jury of the probability calculations provided at trial. Furthermore, testimony regarding DNA testing consumed approximately two of the seven days of trial testimony.[1] Thus, the State squarely focused the jury's attention on the DNA evidence, including the improperly admitted portion. We cannot conclude, as

---

1. We do not here assert, as the dissent implies, that the DNA *statistical evidence* consumed two days of trial testimony. We merely note that, of the seven days of trial, approximately two days were devoted to explaining the DNA testing process, the meaning of the results, and the procedures for deriving the statistical probability calculations. In this context, we think it likely that the jury considered the DNA evidence, including the statistical probability calculations, to be very important to the issue of guilt.

could the *Bible* court, that the DNA evidence "was far from the most telling part of the State's case." *Id.* at 588, 858 P.2d at 1191.

Certainly sufficient admissible evidence exists to support the guilty verdict, but other evidence tended to exculpate Clark. Admitting evidence of DNA probability calculations, however, resulted in a high potential for unfair prejudice. Under these circumstances, and given the analysis and holding of *Bible*, we cannot conclude beyond a reasonable doubt that the erroneously admitted DNA testimony had no influence on the jury's verdict.

### III.

We reverse Clark's convictions and sentences and remand this matter to the superior court for a new trial. Because this resolution renders Clark's Rule 32 petition moot, we deny review of the petition for review.

CLABORNE, P.J., concurs.

GERBER, Judge, dissenting.

I respectfully dissent from the reversal decision and the majority's reason for ordering it.

Admittedly, the Arizona Supreme Court has determined that evidence of DNA probability calculations is error. *State v. Bible*, 175 Ariz. 549, 584–87, 858 P.2d 1152, 1187–90 (1993), *cert. denied, sub nom. Bible v. Arizona*, —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). But that admission is hardly the end of the analysis. Traditionally, an evidentiary error at trial is harmless if the reviewing court can say beyond a reasonable doubt that the error did not contribute to the verdict. *Bible*, 175 Ariz. at 588, 858 P.2d at 1191. *State v. Lundstrom*, 161 Ariz. 141, 150 & n. 11, 776 P.2d 1067, 1076 & n. 11 (1989); *Chapman v. California*, 386 U.S. 18, 24–26, 87 S.Ct. 824, 828–29, 17 L.Ed.2d 705 (1967) (the leading United States Supreme Court decision on harmless error).

The majority opinion rests wholly on *Bible*, which found that DNA probability evidence in that case was harmless error. While noting the great potential for prejudice from this type of error, *Bible* found its facts un-

usual because the DNA probability evidence was disputed and all the other evidence pointed to the one conclusion that the defendant committed the crime.

If the evidence against Defendant had been closely balanced, strong, or even very strong, we think it would be impossible to say beyond a reasonable doubt that the inadmissible DNA evidence did not affect the verdict. Evidence of odds even as "low" as one in sixty million that the blood on Defendant's shirt was not the victims's blood is, to say the least, powerful. Factually, however, this is a very unusual case. Given the testimony describing the dispute over the DNA evidence, that evidence was far from the most telling part of the State's case. The other evidence points with unerring consistency to one inarguable conclusion: that Defendant killed the victim.

*Bible*, 175 Ariz. at 588, 858 P.2d at 1191.

The majority in the present case apparently believes that anything other than that set of facts coupled with DNA probability evidence constitutes reversible error. The majority reads the quoted paragraph to mean that the DNA probability evidence is harmful error unless it is disputed and there is additional "far beyond overwhelming" evidence. I disagree with this reading.

While *Bible* recognizes that DNA probability evidence is potentially very prejudicial, it does not demand the unusually high burden the majority suggests. *Bible* does not announce a new test, nor does it change the traditional harmless error test.

First, nothing in *Bible* expressly alters the traditional harmless error test. In fact, that test as stated in *Lundstrom* is cited with approval. *Id.* In addition, *Bible* notes that the state has the burden of convincing the reviewing court that error is harmless, citing *Chapman*, 386 U.S. at 24–26, 87 S.Ct. at 828–29, and that the error is to be considered in light of all the evidence. *Bible*, 175 Ariz. at 588, 858 P.2d at 1191.

Second, *Bible* misinterprets *Sullivan v. Louisiana*, 508 U.S. ——, —— – ——, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993) (*see* majority opinion and *Bible*, 175 Ariz. at

588, 590, 858 P.2d at 1191, 1193). In *Sullivan*, the United States Supreme Court merely discussed how an improper reasonable doubt jury instruction would always be reversible error. *Sullivan*, 508 U.S. at —, 113 S.Ct. at 2082. *Sullivan* does discuss *Chapman* and the traditional harmless error test briefly, but that test is never applied nor changed. *Id.* 508 U.S. at —, 113 S.Ct. at 2081. The quotes in *Bible* taken from *Sullivan* discuss how an appellate court cannot substitute its judgment for that of the trier of fact when the guilty verdict may not have been beyond a reasonable doubt. Contrary to the majority's view, the *Sullivan* excerpts in *Bible* do not reflect any change in harmless error analysis but only reflect the Court's inability to apply that analysis to the wholly dissimilar facts in *Sullivan* whose references are misleading as applied to the facts of *Bible* and to the present case. *Sullivan* is a case about fundamental reversible error in a jury instruction, not about the principle of harmless error. Any reliance by the majority on *Sullivan* as a standard for harmless error review is without basis.

Third, *Bible's* "closely balanced, strong or even very strong" language about the weight of the evidence is not inconsistent with the traditional test requiring a showing beyond a reasonable doubt that the error did not affect the verdict. The quoted language simply parallels the showing required to meet the different evidentiary burden. A preponderance of the evidence ("closely balanced"), or clear and convincing evidence ("strong or very strong") may be insufficient, but beyond a reasonable doubt evidence ("overwhelming") is sufficient to uphold a verdict under the harmless error test when there is independent evidence of guilt beyond a reasonable doubt.

While our supreme court views DNA probability evidence as "powerful," there is no intimation in *Bible* that DNA probability evidence usurps the harmless error standard. The question then becomes whether the error in the present case is harmless.

The DNA statistical evidence was not, as the majority states, presented for "two days." The DNA evidence which was properly admissible did consume about two days

but the improper evidence of probability—the only error—came at the end of a seven-day trial and consumes about 10 transcript pages—some 20 minutes.

The majority distinguishes this case from *Bible* for the following reasons: (1) the error was not mitigated and (2) the remaining evidence was insufficient under the harmless error test.

First, *Bible* cites cases that have upheld guilty verdicts with "weaker, or at least comparably strong, evidence of guilt independent of the erroneous admission of DNA evidence." *Bible*, 175 Ariz. at 589–90, 858 P.2d at 1192–93. In the four cases cited by *Bible*, (*People v. Barney*, 8 Cal.App.4th 798, 10 Cal.Rptr.2d 731 (1 Dist.1992); *State v. Nielsen*, 467 N.W.2d 615, 619 (Minn.1991); *People v. Wallace*, 14 Cal.App.4th 651, 17 Cal. Rptr.2d 721 (1 Dist.1993); *People v. Atoigue*, 1992 WL 245628 (D.Guam App.Div. Sept. 11, 1992)), only one recognizes any mitigation of the DNA statistical evidence, *Wallace*, 17 Cal.Rptr.2d at 725–26.

Second, while the harmless error analysis in *Bible* is misleading, I believe it does not change the traditional harmless error test. In my view, there is sufficient independent and properly admitted evidence in the record to support the guilty verdict.

Police seized a night stick with dried blood residue on it from beneath Clark's mattress. Clark identified it as his. During a search of Clark's apartment, police found a black scarf, a length of nylon rope, dark shorts with a white waistband, ski gloves and a pair of running shoes in his closet. The victim testified that the assailant wore ski gloves with a velcro strap and dark shorts with a white waistband, tied her up with a nylon or hemp rope, and beat and sexually assaulted her with a stick or club. She testified that the gloves, shorts, rope and nightstick found in Clark's apartment were consistent with items used in the assault.

Blood of a type and gene consistent with the victim was found on the ski gloves, the running shoes, the rope and the scarf from Clark's apartment. Blood of a type consistent with Clark, found in less than 3% of the Caucasian population, appeared on a vaginal

swab of the victim taken after her assault. DNA samples consistent with the victim were found on the scarf and ski gloves. DNA samples consistent with Clark were found on the ski gloves.

A forensic anthropologist and a podiatrist testified that the running shoes had more likely been habitually worn by Clark, not by his roommate. Moreover, Clark's roommate and his roommate's boss testified that the roommate could not have committed the crime because the roommate was working as the cashier of a Tempe gas station from 10 p.m. to 6 a.m. the night of the assault.

While the victim could not positively identify Clark, her description of the assailant matched Clark. She also stated that she and her daughter had observed a neighbor fitting Clark's description watching her shortly before the assault. The victim testified about her physical resistance; Clark had bruising and scratching on his arm that he could not explain.

Clark offered no defense. He did not testify. His only witness was a police officer who testified about an irrelevant issue concerning the victim's movement toward her front door during the assault.

Even without the improper DNA statistics, the evidence of Clark's guilt is overwhelming. As in *Bible,* the other evidence points directly to the one inescapable conclusion that Clark committed the crime. I am convinced beyond a reasonable doubt that the introduction of the DNA probability evidence did not affect this verdict. I would affirm the conviction and along with it the continuing viability of the harmless error standard notwithstanding erroneous DNA probability evidence.