905 P.2d 1002

**The STATE of Arizona, Appellee,**

v.

**Robert Wayne JOHNSON, Appellant.**

**No. 2 CA–CR 92–1007.**

Court of Appeals of Arizona,
Division 2, Department B.

June 2, 1995.

As Corrected June 7, 1995.

Review Granted on issue A and
Denied on other issues Nov. 21, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie and Galen H. Wilkes, Phoenix, for appellee.

Robert Arentz, Sierra Vista, for appellant.

## OPINION

ESPINOSA, Presiding Judge.

Appellant Robert Wayne Johnson was convicted by a jury of one count of sexual assault, a class two felony, for which the trial court imposed an aggravated term of fourteen years' imprisonment. Johnson raises a number of issues on appeal, the most significant being whether the trial court erred in admitting expert testimony about the probability of a random match between Johnson's deoxyribonucleic acid (DNA) and DNA extracted from semen stains on the victim's clothing following the assault. Johnson also challenges the peremptory strike of a juror, the admission of hearsay testimony of the victim's statements, the trial court's recalling of a prosecution witness, a limitation on defense argument during summation; and the court's allegedly bolstering the credibility of a witness. Johnson lastly contests the court's consideration of an unrelated arrest as an aggravating factor at his sentencing. For the reasons discussed below, we affirm.

### Factual Background

We relate the facts in the light most favorable to upholding the jury's verdict. *State v. Atwood*, 171 Ariz. 576, 832 P.2d 593 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). On July 9, 1991, between 8:20 and 8:30 a.m., M.K. arrived at the restaurant she owned in Sierra Vista. After opening the front door, she went to the back door and unlocked it. As she did so, she heard someone enter behind her. She turned around and saw a black man wearing a gray T-shirt with the word "Army" in black letters on the front. The man grabbed her by the hair and threw her to the floor. M.K. landed on her back with the man on top of her. The man choked her, covered her

mouth with one hand, and told her to "shut up." He then forcibly removed M.K.'s pants and had intercourse with her.

The attacker then threatened to kill M.K. if she told anyone and ran out the back door. M.K. pulled up her pants and ran to the front of the restaurant. She saw a small red car drive off, but was unable to see the driver. Using paper towels, M.K., who was menstruating at the time, cleaned herself and wiped up blood that was on the floor. Her boyfriend arrived shortly thereafter and called the police. Sierra Vista police officers responded, interviewed M.K. and took her to the hospital to be examined. At the emergency room, the officers obtained M.K.'s clothing and a police investigator interviewed her again. They later returned to the restaurant and retrieved the paper towels from the trash.

A woman who worked at a check-cashing service frequented by Johnson and located next door to M.K.'s restaurant was friends with Johnson and knew him well. At approximately 7:30 on the morning of the rape, Johnson had visited the woman at her apartment and stayed for about one-half hour. He was wearing a gray T-shirt with the word "Army" across the front. She did not see a vehicle but Johnson had previously given her rides in a red compact car. Later that day, the woman heard a radio broadcast describing a black man who had "assaulted a local business woman." Realizing that the description matched that of Johnson, she called the police. Another witness advised police that around 8:05 that morning, as she drove to work in an area near M.K.'s restaurant, she was followed by a black man wearing a gray shirt that said "Army" who was driving a small red car. The following day, M.K. identified Johnson in a photographic line-up.

The paper towels and M.K.'s shirt were examined and found to contain human blood and semen. Testing performed by Terry Hogan, a criminalist at the Arizona Department of Public Safety (DPS) crime laboratory, showed that DNA extracted from these stains "matched" Johnson's DNA at five different chromosome locations or "alleles." [1] Hogan calculated the possibility of a random match—two unrelated individuals having the same DNA pattern across five alleles—to be one in 312 million. At trial, Johnson testified he had never owned a gray Army T-shirt and was home at the time of the rape. He also introduced corroborating testimony from members of his wife's family.

## Admission of Random Match Evidence

Generally, the decision whether to admit expert testimony is addressed to the sound discretion of the trial court. *State v. Neal*, 143 Ariz. 93, 692 P.2d 272 (1984). Before the results of a new scientific theory will be admitted into evidence, however, there must be a showing that the theory is generally accepted in the relevant scientific community under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), which remains the test in Arizona for the admission of new scientific evidence. *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); *State v. Hummert*, 183 Ariz. 484, 905 P.2d 493 (App. 1994). Johnson contends that the trial court could properly admit expert DNA testimony under *Bible* only as to the existence of a DNA match, and only to indicate that he *could* be the source of the suspect sample. He challenges the admission of the random match probability testimony, arguing that 1) it was expressly precluded by *Bible*, 2) the

1. In a two-day pretrial hearing, the state introduced detailed testimony by Hogan and Dr. Richard Hallick, a molecular biology professor at the University of Arizona, about DNA analysis and DPS laboratory procedures. Simply stated, DNA is present in most cells of living organisms and is made up of many components whose precise pattern determines each individual's genetic code. Certain locations or segments of that pattern determine certain genetic traits, both common and unique, and are called alleles. Because many reported cases have previously outlined the complex scientific basis and testing protocols involved in DNA typing, specifically as in this case, what is known as restriction fragment length polymorphism (RFLP) analysis, and because those matters are not at issue in this appeal, we forego adding our own account. For a general overview of DNA and DNA profiling, *see State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). For a more detailed explanation, *see State v. Anderson*, 118 N.M. 284, 881 P.2d 29 (1994), or *State v. Cauthron*, 120 Wash.2d 879, 846 P.2d 502 (1993).

probability calculation method DPS used in this case lacks general acceptance in the scientific community, and 3) the procedure and underlying genetic database DPS utilized were inadequate to support the expert's probability conclusion.

### a. Background

Although, except for identical twins, the overall genetic code of each individual is unique, over 99% of the DNA sequence in any two people is identical. Consequently, because present technology permits only the testing of very limited DNA segments rather than the entire sequence, confirmation of a DNA match is in and of itself meaningless without a scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance. *See Bible,* 175 Ariz. at 576–77, 858 P.2d at 1170–71, citing D.H. Kaye, *The Admissibility of DNA Testing,* 23 Cardozo L.Rev. 353, 354 (1991). "Without the probability assessment, the jury does not know what to make of the fact that the patterns match: the jury does not know whether the [matching] patterns are as common as pictures with two eyes, or as unique as the Mona Lisa." *Bible,* 175 Ariz. at 587, 858 P.2d at 1190, quoting *United States v. Yee,* 134 F.R.D. 161, 181 (N.D. Ohio 1991). Thus, the final and crucial step for purposes of forensic DNA comparison is calculating the probability of just how rare, or common, such a match may be.

Several methods are available to scientists to make the calculation, including the "counting method," the "product" or "multiplication rule," and two newer formulas which have been recommended by the National Academy of Sciences' National Research Counsel (NRC),[2] called the "ceiling method" and the "modified ceiling method." National Research Council, Committee on DNA Technology in Forensic Science, *DNA Technology in Forensic Science* (1992) (hereafter NRC Report).[3] The latter two methods are best understood when compared to the product rule that was examined in *Bible.*

Under the product rule, each DNA matching band (allele) is presumed to provide statistically independent evidence, and the frequencies of the individual alleles are multiplied together to obtain a frequency of the complete DNA pattern. The process is described in *Bible* as follows:

Suppose, for example, that a pair of DNA [samples] match on two bands, and that one band reflects an allele found in ten percent of the population and the other an allele found in fifty percent of the population. Applying the product rule, an analyst would conclude that the probability of a coincidental match on both alleles is $0.10 \times 0.50 = 0.05$, or a five percent probability.

175 Ariz. at 582–83, 858 P.2d at 1185–86, quoting William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests,* 75 Va. L.Rev. 45, 81–82 (1989).

The product rule was generally unchallenged until 1991 when some members of the scientific community began questioning the calculations derived from this formula. *See Bible,* 175 Ariz. at 584, 858 P.2d at 1187. Their concern focused primarily on the product rule's failure to account for the possibility of "population substructures," that is, "genetic subgroups which would 'most likely occur along racial and ethnic lines and present significant pockets of genetic variation within the larger population group.'" *State v. Sivri,* 231 Conn. 115, 157, 646 A.2d 169, 190 (1994), quoting *Commonwealth v. Lanigan,* 413 Mass. 154, 160–61, 596 N.E.2d 311, 315 (1992) (*Lanigan I* ). *See* Richard C. Lewontin & Daniel L. Hartl, *Population Genetics in Forensic DNA Typing,* 254 Science 1745 (Dec. 20, 1991). This possibility cast doubt on two of the rule's central assumptions: 1) "linkage equilibrium," the theory that particular DNA bands identified by DNA processing "behave independently," and 2) "Hardy–

---

**2.** NRC members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine.

**3.** At the time of the *Frye* hearing in this case, the NRC report had not yet been published. However, the trial court was presented with the NRC's prepublication manuscript, which detailed its recommendations.

Weinberg equilibrium," which presumes that the members of the racial groups represented in the databases randomly mate within their groups, i.e., without regard to religion, ethnicity, or geography.[4] *People v. Barney*, 8 Cal.App.4th 798, 814, 10 Cal.Rptr.2d 731, 741 (1992). Because the likelihood of correlation between alleles is greater in a substructured population, critics contended that the product rule could produce a frequency estimation much lower than the actual genotype frequency. The following example illustrates their point:

> If a population survey of Europe showed that 1 of 10 people had blond hair, 1 of 10 had blue eyes, and 1 of 10 had fair skin, one would be wrong to multiply these frequencies to conclude that the frequency of people with all three traits was 1 in 1,000. Those traits tend to co-occur in Nordics, so the actual frequency of the combined description is probably higher than 1 in 1,000.

*State v. Bloom*, 516 N.W.2d 159, 161 (Minn. 1994), quoting NRC Report § 3.2.2, at 3–3.

In 1992, following a two-year study, the NRC proposed a more conservative calculation method, which has become known as the "ceiling principle" or "ceiling method." It involves two steps:

> (1) For each allele at each locus, determine a *ceiling frequency* that is an upper bound for the allele frequency that is independent of the ethnic background of a subject; and (2) To calculate a genotype frequency, apply the multiplication rule, using the ceiling frequency for the allele frequencies.

NRC Report § 3.2.6, at 3–10 to 3–11. The ceiling frequency is determined by analyzing a database of 100 random samples from each of fifteen to twenty ethnic populations and calculating the allelic frequencies at a particular chromosome locus for each population sampled. *Id.* at 3–11. "In other words, for a particular allele exhibited at a particular locus, the testing laboratory would calculate the percentage of individuals within each ethnic population exhibiting the same, or a statistically similar, allele at the same locus."

*State v. Vandebogart*, 139 N.H. 145, 153, 652 A.2d 671, 676 (1994) (*Vandebogart II*). The laboratory then compares the largest frequency in any of the ethnic populations with a scientifically derived "upper bound" frequency of five percent and uses the larger of the two as the "ceiling" in subsequent calculations. This process is repeated for each allele in the subject's DNA profile. The final genotype frequency is determined by multiplying the ceiling frequencies of all the alleles. *Id.* While the ceiling method still makes use of the multiplication rule in its calculation, it yields a much more conservative probability estimate because it "automatically ... provide[s] for the greatest, and therefore most conservative, estimate of the frequency of a DNA profile." *Lanigan I*, 413 Mass. at 163, 596 N.E.2d at 316. As Hogan explained at the *Frye* hearing, it puts "a ceiling on how rare any individual DNA band frequency can be" and "eliminates even [the] theoretical possibility of a subgroup."

Recognizing that most laboratories would not have a large enough blood sample base to implement the ceiling method, the NRC committee also advanced an even more conservative "modified ceiling method," to be utilized while reference blood samples are being collected and archived. NRC Report § 3.7.2, at 3–20 to 3–23. This method uses an artificially high ceiling frequency of ten percent or larger (rather than five percent) and requires analysis of data on at least three of the major races (e.g., Caucasians, Blacks, Hispanics, Asians, or Native Americans). Hogan utilized the modified method in this case and a database consisting of two hundred samples from each of four ethnic groups: Caucasians, Hispanics, Blacks, and Apache Indians.

**b. Applicability of *Bible***

In order to determine whether the probability evidence at issue here is precluded by *Bible*, we must first review the pertinent facts and reasoning of that case. After demonstrating that DNA in the blood on the defendant's shirt and the victim's DNA were a "match," a Cellmark[5] DNA expert, using

---

4. For a more complete explanation of Hardy-Weinberg and linkage equilibrium, *see Cauthron.*

5. Cellmark Diagnostic Laboratories, Inc. is one of several commercial laboratories that performs forensic DNA typing and analysis.

the product rule, calculated the random match probabilities to be between one in sixty million and one in fourteen billion. 175 Ariz. at 562, 858 P.2d at 1165. Although the trial court found this evidence admissible under *Frye*, our supreme court disagreed, noting the controversy in the scientific literature discussed above as well as disagreement among courts on DNA probability calculations. Consequently, the court found that "the Cellmark method of deriving the random match probability figures is not generally accepted in the relevant scientific community." *Id.* at 585, 858 P.2d at 1188. In doing so, it identified, for *Frye* purposes, three specific flaws with the Cellmark method: 1) it was based on the disputed assumption of linkage equilibrium; 2) Cellmark's database was of disputed statistical validity; and 3) the database was concededly not in Hardy–Weinberg equilibrium. *Id.* The court concluded that the product rule and the resulting random match opinion were not based on generally accepted scientific theory and, therefore, "the [trial] court erred in admitting the probability testimony based on the product rule calculations." *Id.* at 586, 858 P.2d at 1189 (footnote omitted).

Clearly, the ruling in *Bible* was bound to the Cellmark method of product rule probability calculation and the Cellmark database involved. The subsequent decision of *State v. Clark*, 181 Ariz. 42, 887 P.2d 572 (App. 1994), cited by Johnson, only bears this out. That case also involved the admission of Cellmark's probability calculations not long after the *Bible* trial, and Division One of this court had to look no further than the express holding of *Bible* to find error. In another intervening case, however, while suggesting a broad rule of preclusion by finding reversible error in the admission of nonstatistical expert testimony about the significance of a DNA match, Division One pointed out that the parties had not raised the issue whether the underlying probability calculations there,

not having been produced by Cellmark, fell outside the holding of *Bible*.[6] *Hummert*, 183 Ariz. at 489, 905 P.2d at 498. That issue is squarely presented in the case at hand.

If, under *Bible*, neither random match statistical probabilities nor qualitative testimony about the significance of a DNA match may be admitted at trial,[7] then it would appear that DNA evidence is of limited evidentiary value in Arizona criminal cases and, as Johnson urges, can only show that suspect DNA *could* be that of a defendant. *See* 175 Ariz. at 587, 858 P.2d at 1190.. As noted in *Bible*, other courts have gone further, holding that because the statistical calculation is the pivotal element of DNA analysis, absent an admissible probability estimate, DNA evidence must be excluded entirely. *See People v. Watson*, 257 Ill.App.3d 915, 196 Ill.Dec. 89, 629 N.E.2d 634 (1994); *Lanigan I; State v. Vandebogart*, 136 N.H. 365, 616 A.2d 483 (1992) (*Vandebogart I*); *State v. Cauthron*, 120 Wash.2d 879, 846 P.2d 502 (1993). Neither result, however, is mandated by *Bible*. Indeed, the court there said as much:

> We take a cautious, conservative approach. Not knowing what records in other cases will show, what issues those cases will raise, or what new technology will bring, we neither write in stone nor go farther than we must.... We hold only that statistical probability evidence based on Cellmark's database is not based on generally accepted scientific theory and is not admissible.

175 Ariz. at 590, 858 P.2d at 1193. We conclude that *Bible*, while setting parameters for the discussion, does not answer the primary questions at hand, namely, whether the ceiling method of DNA probability calculation has gained general acceptance in the relevant scientific community and whether the NRC-recommended database DPS utilized in this case was sufficient.

Division One panel recently declined to follow *Hummert* and upheld the admission of expert testimony that the DNA in seed pods found in the defendant's truck and that of a tree at the scene of the crime were "identical."

---

**6.** *Bible* itself pointed out that many cases admitting DNA probability calculations were distinguishable because they involved other laboratories than Cellmark and different databases. 175 Ariz. at 584, 858 P.2d at 1187.

**7.** *But see State v. Bogan*, 183 Ariz. 506, 513, 905 P.2d 515, 522 (App.1995), in which a different

### c. General Acceptance of the Ceiling Method

Following a two-day hearing, the trial court found that the DNA evidence and the state's expert testimony met the *Frye* standard of general scientific acceptance. Hogan testified that, in calculating the chance of a random match with Johnson's DNA, he used the modified version of the ceiling method recommended by the NRC, that the NRC is a group of scientists who are members of the National Academy of Sciences, and that its reports "carry weight and [are] respected within the scientific and technical community." He also testified that, as part of "keeping abreast" of developments, he had read NRC reports and opinions discussing DNA forensic analyses. Hogan's testimony is consistent with the observations of courts that

> the [NRC] itself is a distinguished cross section of the scientific community.... Thus, that committee's conclusion regarding the reliability of forensic DNA typing, specifically RFLP analysis, and the proffer of a conservative method for calculating probability estimates can easily be equated with general acceptance of those methodologies in the relevant scientific community.

*United States v. Porter*, 618 A.2d 629, 643 n. 26 (D.C.App.1992) (*Porter I* ), quoting *United States v. Bridgett*, 120 Daily Wash.L.Rep. 1697 (D.C.Super.Ct.1992); *see also Cauthron*, 120 Wash.2d at 908–09, 846 P.2d at 517 (NRC's adoption of modified ceiling method "indicates sufficient acceptance within the scientific community" for *Frye* purposes); *accord State v. Alt*, 504 N.W.2d 38 (Minn. App.1993).

The NRC recommendations were formulated in response to the criticisms of the product rule, *see State v. Anderson*, 118 N.M. 284, 881 P.2d 29 (1994), and appear to directly address the scientific concerns our supreme court identified in *Bible* about the reliability of probability calculations based on that rule. First, the ceiling principle assumes that population substructuring may

exist. NRC Report § 3.2.4, at 3–7. In other words, it acknowledges that members of ethnic groups may mate within a specific subgroup with persons of like religion or ethnicity or who live within close geographical distance. *See Barney*. It then establishes a method of statistical calculation that accounts for the possibility of population substructuring influencing the frequency of particular alleles by utilizing a "ceiling frequency" that exceeds the probable range of allele frequencies in any ethnic subgroup. NRC Report §§ 3.2.2 at 3–3, 3.2.6 at 3–10; *Barney*. Thus, unlike the Cellmark methodology examined in *Bible*, the ceiling method probability estimate is not likely to be affected by any Hardy–Weinberg or linkage disequilibrium arising from substructuring. As the Vermont Supreme Court recently observed, "The use of the ceiling principle will eliminate the objections we have itemized [on the possibility of population substructure and allele linkage] and allow introduction of DNA match statistics consistent with legitimate accuracy concerns of defendants." *State v. Streich*, —— Vt. ——, 658 A.2d 38, 48–49 (1995).

■ Also unlike the situation our supreme court faced in *Bible*, there is no evidence in the record of any serious disagreement in the scientific community on the use of the ceiling method. Although Hogan testified that there is scientific debate on the existence of population substructures, subsequent cases and published articles in the field indicate that most of the remaining debate stems from criticisms that the ceiling method is *too* conservative, that evidence of population substructure is lacking, and that further study is needed to determine the best means of presenting probability statistics to juries, not the ceiling method's validity as a reliable and highly conservative forensic tool.[8] *See Commonwealth v. Lanigan*, 419 Mass. 15, 641 N.E.2d 1342 (1994) (*Lanigan II* ) (criticisms largely call for more tests; none of the criticisms fundamental, citing Richard Lempert, *DNA, Science and the Law: Two Cheers for the Ceiling Principle*, 34 Jurimetrics Journal

---

8. As in *Bible*, much of the case law and scientific literature we refer to was unavailable at the time of Johnson's trial. Because "neither logic nor authority supports confining ourselves to a snapshot, rather than viewing the motion picture, of technological advancement," 175 Ariz. at 587 n. 33, 858 P.2d at 1190 n. 33, we survey all information available and consider cases and scientific literature published after trial.

41 (Fall 1993)); *Bloom* (notwithstanding debate over most accurate way of estimating and presenting random match probability, very conservative nature of NRC approach justifies admission of quantitative evidence); *Alt* (debate as to existence of subgroups and NRC policy judgments does not deprive NRC method of scientific acceptance under *Frye*); *Vandebogart II* (experts agree ten percent ceiling frequency so conservative as to not exist in nature, but a valid scientific technique to build conservative features into statistical results); Eric S. Lander & Bruce Budowle, *DNA Fingerprinting Dispute Laid to Rest*, 371 Nature 735 (Oct. 27, 1994) (debate over ceiling method purely academic and irrelevant to courtroom use); *see also* D.H. Kaye, *The Forensic Debut of the National Research Council's DNA Report: Population Structure, Ceiling Frequencies and the Need for Numbers*, 34 Jurimetrics Journal 369 (Summer 1994) (little scientific dispute that ceiling methods produce generous probability estimates—so generous as to provoke antagonism by scientists). *Cf. People v. Soto*, 30 Cal.App.4th 340, 35 Cal. Rptr.2d 846 (App.1994), *petition for review granted*, 890 P.2d 1115, 39 Cal.Rptr.2d 406 (1995) (criticisms related to effects of population substructure refuted by new data; NRC approach therefore unnecessary). Of course, the *Frye* test does not require unanimity in the scientific community. *State v. Velasco*, 165 Ariz. 480, 799 P.2d 821 (1990). As the court pointed out in *Soto:*

> If the [general acceptance] requirements were met only if there were *no* debate on a subject, even Copernicus's theory of a sun-centered solar system could not be mentioned in a court of law. The flat earth society would carry the day. Indeed, no scientific advance has yet been developed that cannot be questioned or debated. For this reason, evidentiary rules do not require absolute certainty or unanimity.

30 Cal.App.4th at 358, 35 Cal.Rptr.2d at 856 (citations omitted).

After remanding a DNA-based conviction for a *Frye* hearing on the ceiling principle,

the New Hampshire Supreme Court held that the NRC modified ceiling method "has gained general acceptance in the relevant scientific community." *Vandebogart II*, 139 N.H. at 151, 652 A.2d at 675. On the other side of the country, a California appellate court has recently observed "a general 'cease fire' in the relevant scientific community," noting that "this cease fire has resulted for the time being in general acceptance of the evidentiary value of DNA statistical analysis produced in strict accordance with the NRC methodology." *People v. Venegas*, 31 Cal. App.4th 234, 249 n. 12, 36 Cal.Rptr.2d 856, 865 n. 12, *petition for review granted*, 890 P.2d 1117, 39 Cal.Rptr.2d 408 (1995). Similarly, the Vermont Supreme Court has found that "[t]here is general acceptance within the scientific community that the ceiling principle over-compensates for any population substructure or allele linkage." *Streich*, 658 A.2d at 49; *accord United States v. Porter*, No. F06277–89, 1994 WL 742297 (D.C.Super.Ct. Nov. 17, 1994) (*Porter II*).

Recent scientific literature and scholarly comment appear to bear this out. Of particular significance is an article in a prominent scientific journal coauthored by two noted geneticists introduced as "principals in the once-raging debate over forensic DNA typing," who together declare that "[t]he DNA fingerprinting wars are over," and who describe the ceiling method as providing a "solomonic solution" to the controversy over population genetics. Lander & Budowle, *DNA Fingerprinting Dispute Laid to Rest, supra*, at 736–37. *See also* Kaye, *Ceiling Frequencies and the Need for Numbers, supra*. Even geneticists Richard Lewontin and Daniel Hartl, two of the leading challengers of DNA probability calculations, *see Bible*, 175 Ariz. at 585, 858 P.2d at 1158, have since written: "Everyone agrees that [the modified ceiling principle] is conservative, and some believe that it is too conservative. Whether or not it is excessively conservative is a matter that can be resolved empirically by ethnic group studies." Lewontin & Hartl, *DNA Fingerprinting Report*, 260 Science 473, 474 (April 23, 1993).[9]

---

9. We note that in response to calls for further empirical data, the FBI completed a worldwide population study that rebuts the hypothesis that population subgroups significantly affect DNA probability estimates. IA U.S. Dept. of Justice,

Most importantly, there is agreement among experts and courts that the ceiling method "resolves all uncertainties in favor of the defendant." *Vandebogart II*, 139 N.H. at 157, 652 A.2d at 678; *see Lanigan II* (one principle underlying ceiling method is that any error in calculating profile frequency should accrue to benefit of individual against whom DNA testing is being used). As set forth in the NRC report:

> The ceiling principle yields the same frequency for a genotype, regardless of the suspect's ethnic background, because the reported [ceiling] frequency represents a maximum for any possible ethnic heritage. Accordingly, the ethnic background of an individual suspect should be ignored in estimating the likelihood of a random match. The calculation is fair to suspects, because the estimated probabilities are likely to be conservative in their incriminating power.

NRC Report § 3.2.6, at 3–13. *See also* Eric S. Lander, *DNA Fingerprinting: The NRC Report*, 260 Science 1221, 1221 (May 28, 1993) ("[T]he NRC committee sought to define common ground, namely, a standard of practice so conservative as to ensure that there would be no serious scientific argument that the evidence could be said *to overstate* the case against a defendant.").

It is notable that all reported decisions we are aware of addressing the NRC recommendations have found them either sufficiently accepted among the scientific community or sufficiently reliable under alternative evidentiary standards to permit the admission of probability testimony based on their use.[10] Several other courts have commented on the likelihood that the ceiling method would resolve the admissibility problems associated with DNA probability calculations.[11]

Based on the record before us and in light of the guidance of *Bible* and other courts which have since addressed this issue, as well as current scientific and scholarly literature, we cannot say the trial court erred in finding the probability testimony here, derived from the NRC modified ceiling method, to be sufficiently accepted in the scientific community for purposes of *Frye*.

### d. DPS Methodology and Database

Johnson alternatively contends that, even if the ceiling principle has gained general acceptance, the method DPS used was flawed because Hogan failed to comply with the accepted procedure and because DPS lacked a sufficiently random database for accurate probability calculations. We find little support in the record for either claim. As for the DPS database, there is no evidence refuting its sufficiency, nor can we find that it bears any resemblance to Cellmark's "1988 Caucasian database" which the court in *Bible* found "of disputed statistical validity," and which had already been discarded by Cellmark at the time of Bible's trial. 175 Ariz. at 585–86, 858 P.2d at 1188–89. Hogan testified that, in accordance with the modified ceiling method, he utilized a database of approximately 800 blood samples representing four racial groups: Caucasians, Hispanics, Blacks, and Apache Indians. Of those samples, DPS individually analyzed 764. As noted earlier, the NRC method requires analysis of data on three major races.

Johnson also urges that Hogan's methodology was deficient in that it did not account for racial population substructures and because Hogan failed to search the DPS database for a match as the NCR recommends. As discussed above, the entire

---

FBI Rep., *VNTR Population Data: A Worldwide Study* (1993).

**10.** *See Venegas; Soto; Porter II; Bridgett; Brim v. State*, 654 So.2d 184 (Fla.Ct.App.1995); *Lanigan II; Bloom; Alt; Vandebogart II; Anderson; State v. Duran*, 118 N.M. 303, 881 P.2d 48 (1994); *Streich; State v. Buckner*, 125 Wash.2d 915, 890 P.2d 460 (1995); *Cauthron; State v. Peters*, 192 Wis.2d 674, 534 N.W.2d 867 (Wis.Ct. App.1995); *Springfield v. State*, 860 P.2d 435 (Wyo.1993).

**11.** *See Barney; Sivri; Vargas v. State*, 640 So.2d 1139 (Fla.App.1994), *review granted, State v. Vargas*, 659 So.2d 273 (Fla.Sup.Ct.1995); *Watson; Commonwealth v. Daggett*, 416 Mass. 347, 622 N.E.2d 272 (1993) (Wilkins, J., concurring); *Cf. People v. Wallace*, 14 Cal.App.4th 651, 659–60, 17 Cal.Rptr.2d 721, 725 (1993) (at time of decision, too soon "to confirm our speculation that the new method of statistical calculation proposed by the NRC report will likely receive general acceptance resulting in future admissibility of DNA analysis evidence").

thrust of the ceiling method is the recognition of and accounting for the possibility of ethnic substructure. Hogan testified that he analyzed the DNA samples in accordance with all requirements of the modified ceiling method, and he outlined in detail various DPS procedures for ensuring the accuracy and quality of test results, noting that the laboratory had undergone several proficiency tests and that its laboratory error rate was currently zero. Hogan explained that he did not attempt to compare Johnson's DNA to all database samples due to an agreement between the commercial sample supplier and the individual donors. A review of the NRC report reflects that database sample comparison is part of the NRC's suggested procedure for indicating the rarity of the subject DNA pattern, NRC Report § 3.7.2, but it clearly is not an element of the ceiling method.

We therefore conclude that the trial court did not abuse its discretion in admitting the random match probability testimony. In light of this conclusion, we do not reach the state's argument that any error in admitting it would have been harmless considering the other evidence of Johnson's guilt.

### Peremptory Strike of a Minority Juror

The state used a peremptory challenge to strike a prospective juror and Johnson objected, claiming that the juror was "part Black" or the only juror on the panel "who could be Black," and requested that the state be required to explain the basis for its strike. The court denied the request on the ground that it did not "see a proper basis for a *Batson* [12] challenge in this case" because the defendant had not shown that there was "some nexus in striking all of any minority element."

■ On appeal, Johnson contends that the court erred in not requiring the prosecutor to state a race-neutral reason for the peremptory strike after Johnson made a *prima facie* showing of purposeful discrimination. Although we agree that a *prima facie* case can be established by showing that the prosecutor used a peremptory challenge to remove

the only person of the same ethnicity as the defendant, *see State v. Bailey,* 160 Ariz. 277, 772 P.2d 1130 (1989); *State v. Jackson,* 170 Ariz. 89, 821 P.2d 1374 (App.1991), the circumstances of this case fail to "raise an inference that the prosecutor used [his] peremptory strike to exclude [the] juror solely on account of race." *State v. Jordan,* 171 Ariz. 62, 66, 828 P.2d 786, 790 (App.1992).

The transcript of the *voir dire* examination reflects that both the judge and the prosecutor were unsure of the race of the potential juror. The judge supposed that he was not Caucasian, but did not believe that he was Black. More importantly, the prosecutor expressly stated that he had not perceived that the potential juror was Black, part Black, or non-Caucasian.

■ The record does not support the inference that the prosecutor struck the juror because of race. The prosecutor rightly or wrongly thought the juror was Caucasian. Moreover, the final make-up of the jury included other minority individuals. In light of the lack of facts supporting an inference that the prosecutor's peremptory challenge was racially motivated, the trial court could find that Johnson had not satisfied his burden of showing a *prima facie* case. *See Jordan.* Accordingly, we find no error in the court's denial of Johnson's request that the state explain its peremptory strike.

### Victim's Hearsay Statements

Prior to trial, the state moved *in limine* to admit out-of-court statements M.K. made to both the police and the examining physician at the hospital on the ground that they were admissible under Ariz.R.Evid. 803(2), 17A A.R.S., as excited utterances. The statements included a physical description of the assailant and the only evidence of forced fellatio. The state also sought to introduce M.K.'s statement when she identified Johnson from a photographic line-up the following day. The trial court initially denied the motion as to the statements made to police at the hospital. Following the state's offer of proof, the trial court reversed its ruling, finding the statements to both the physician and

---

**12.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct.    1712, 90 L.Ed.2d 69 (1986).

the police admissible under the excited utterance exception. The court also ruled that the state could introduce M.K.'s statement at the photographic line-up if she testified.

■ Johnson contends that the trial court erred in admitting these statements because "by the time [M.K.] was at the hospital, she was no longer suffering from the immediate emotional alarm." For a statement to be admissible as an excited utterance, three requirements must be satisfied: 1) there must have been a startling event, 2) the statement must have been made soon after the event so that the declarant did not have time to fabricate, and 3) the statement must relate to the startling event. *State v. Whitney,* 159 Ariz. 476, 768 P.2d 638 (1989).

■ M.K. was violently raped around 8:30 a.m. The rapist told her he knew where she lived and he threatened to kill her. She was examined by Dr. Wissing at the hospital at approximately 9:33 a.m. Wissing testified that throughout the examination, M.K. was "upset ... frightened and overall nervous." Immediately afterwards, Detective Tutor interviewed M.K. in the hospital examining room. He testified that she was "mad, angry" and did not want to speak to him. Even when she did talk to him, she would "cry at times and [become] angry at other times."

These facts support the inference that when M.K. was interviewed, she was still suffering from the emotional trauma of the rape. "Testimony that a declarant still appeared nervous or distraught and that there was a reasonable basis for continuing emotional upset can be sufficient proof of spontaneity even where the interval between the startling event and the statement is long enough to permit reflective thought." *State v. Anaya,* 165 Ariz. 535, 540, 799 P.2d 876, 881 (App.1990). That one to two hours had passed since the rape or that M.K. responded to questions by the physician and the police officer does not change this conclusion. An excited utterance is not necessarily inadmissible because made in response to a question. *See Whitney.* Moreover, "[i]ncidents involving rape or other sexual offenses have long been viewed as presenting unique circumstances when the spontaneous utterance ex-

ception is sought to be applied.... Generally a less demanding time aspect is required." *State v. Rivera,* 139 Ariz. 409, 412, 678 P.2d 1373, 1376 (1984) (citation omitted). Under the totality of the circumstances, we find no abuse of discretion by the trial court in admitting the statements.

■ We also find no error in the trial court's admission of M.K.'s statement at the photographic line-up. Evidence Rule 801(d)(1)(C) provides that a statement is not hearsay if the declarant testifies at trial and is subject to cross-examination and if the statement is "one of identification of a person made after perceiving the person." M.K. testified at trial, and her prior statement involved the visual identification of Johnson as the rapist. Because her statement was clearly within the scope of the rule, we find no error in its admission.

### Trial Court's Comment on Witness

■ Johnson next contends that the trial court improperly commented on Detective Tutor's credibility and "aligned [itself] with [him]." Just before Tutor testified for a second time, the court remarked:

> Mr. Tutor, if you'll come up and be sworn, please. Probably unnecessary. I think you were sworn when you took the stand earlier briefly. Now, you are doubly truthful.

Because Johnson did not object, the issue has been waived on appeal, *State v. Lichon,* 163 Ariz. 186, 786 P.2d 1037 (App.1989), unless it involves fundamental error. *State v. Gendron,* 168 Ariz. 153, 812 P.2d 626 (1991). Error is fundamental when it goes to the foundation of the case or is of such dimension that the defendant cannot be said to have had a fair trial. *Id.*

■ We do not believe the court's remark could reasonably be considered a comment on Tutor's credibility or, as Johnson suggests, an expression of "the court's opinion regarding the state's case." Before a statement by a trial court will be considered a comment on the evidence, it must express an opinion of what the evidence proves. *State v. Barnes,* 124 Ariz. 586, 606 P.2d 802 (1980). The situation at issue is nothing like

that in *Landrigan v. State*, 700 P.2d 218 (Okla.1985), cited by Johnson, where the trial court specifically commented on the truthfulness of certain witnesses' testimony. In context, the court's statement here was merely an offhand remark, referring to Tutor's having been sworn previously. We find no error, much less fundamental unfairness.

### Recalling State Witness

After beginning its deliberations, the jury sent two questions to the trial court: 1) "Were photos in the same format (these mounted) when presented to [M.K.], or loose in the folder?" and 2) "Does Mr. Johnson have a limp now or at the time of [M.K.'s] attack?" The trial court, over defense objection, recalled Detective Tutor as "the court's witness" to answer the questions. Johnson contends that this unusual procedure prejudiced his defense. We disagree. The record shows that throughout the trial, the court had encouraged questions from the jury. At this particular time, the court explained to the jury that it had consulted with both counsel and was recalling Tutor only because he was one of the witnesses who was able to answer the questions and because he was still there. When Tutor was called, the court asked him only those questions that the jurors had raised. The court then gave both attorneys an opportunity to examine Tutor, an opportunity which defense counsel declined. The trial court has wide discretion in calling and examining witnesses. Ariz. R.Evid. 614(a), 17A A.R.S. Having found no evidence of prejudice to Johnson, we cannot say that the court's procedure was an abuse of discretion.

### Preclusion of Johnson's Argument

In closing argument, defense counsel attempted to discredit the testimony of the woman Johnson visited the morning of the rape as to the times that Johnson had arrived at and left her apartment, arguing that the interviewing officer might have "inadver-

tently" suggested to her the "correct time." The trial court sustained the state's objection. Johnson contends that the court erred in precluding "fair rebuttal" to the state's attempt to discredit his alibi witnesses. This claim is without merit as there is no evidence in the record to support it. While counsel are given wide latitude in closing arguments and may draw all justifiable and reasonable inferences from the evidence, they may not argue matters not in evidence. *State v. Garcia*, 165 Ariz. 547, 799 P.2d 888 (App.1990). The trial court properly sustained the objection.

### Sentencing

Lastly, Johnson contends that the trial court erred in utilizing the "mere report of an arrest" and pending charge of attempted murder in Pima County as an aggravating circumstance, requiring that he be resentenced. We disagree. The trial court considered more than Johnson's arrest in using the Pima County charges as an aggravating factor. It also considered the fact that a grand jury had found probable cause to believe that, while on release, Johnson committed attempted first-degree murder, sexual assault, kidnapping, first-degree burglary, and sexual abuse.[13]

A trial court may aggravate a sentence based on prior incidents that do not result in convictions provided there is some " 'evidence of the underlying facts to demonstrate that a crime or some bad act was *probably committed* by the defendant.' " *State v. Rebollosa*, 177 Ariz. 399, 401, 868 P.2d 982, 984 (App.1993), quoting *State v. Shuler*, 162 Ariz. 19, 21, 780 P.2d 1067, 1069 (App.1989). A finding of probable cause satisfies this requirement. *See Rebollosa* (sentence properly aggravated based on another court's finding of probable cause that defendant had committed intervening crime while

---

13. On April 6, 1993, a Pima County jury found Johnson guilty on all six counts. These convictions were affirmed by this court in *State v.* *Johnson*, 2 CA–CR 93–0295 (memorandum decision filed September 29, 1994).

on release). The trial court did not err in aggravating Johnson's sentence.

We have reviewed the entire record for fundamental error and have found none.

The conviction and the sentence imposed are affirmed.

DRUKE, C.J., and HATHAWAY, J., concur.