The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date: March 27, 2025

**NO. S-1-SC-39785**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**RICARDO SOTO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY**
Jared G. Kallunki, District Judge

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Charles J. Gutierrez, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**ZAMORA, Justice.**

{1}    In this capital appeal, Defendant Ricardo Soto challenges his conviction for intentional child abuse resulting in death, contrary to NMSA 1978, § 30-6-1(D), (H) (2009). He asks us to reverse his conviction because (1) the evidence adduced at trial, which was largely in the form of expert medical testimony, was insufficient to support a finding beyond a reasonable doubt that he intentionally abused the victim or caused his death, (2) the district court improperly agreed to admit Defendant's prior conviction for perjury as rebuttal evidence if he sought to introduce evidence of his good character as a parent, and (3) the State elicited statistical evidence that improperly usurped the fact-finding role of the jury. We conclude that sufficient evidence supported Defendant's conviction, and Defendant has failed to establish reversible error in the trial court's evidentiary rulings. We affirm.

## I.    BACKGROUND

{2}    This case arises from the tragic death of two-year-old Jeremiah Nevarez. Jeremiah was the biological child of Abigail Nevarez and Defendant. When Abigail was about six months pregnant, she reached out to Defendant about the baby, but he failed to respond. A DNA test later proved that Defendant was Jeremiah's biological parent, and he then sought visitation with Jeremiah. Initially, Abigail accompanied

Jeremiah on his visits with Defendant, but over time Jeremiah began to stay with Defendant for a night at a time without Abigail. However, Defendant's requests for visitation with Jeremiah were irregular and infrequent.

{3} On Friday, June 1, 2018, Defendant asked Abigail if Jeremiah could spend the weekend with him. Two days later, he asked Abigail to extend the visit for the rest of the week because "Jeremiah was having a good time." Abigail agreed. During this time period, Jeremiah attended daycare, where Abigail worked as a caregiver in a different area of the facility. Abigail typically picked Jeremiah up from daycare at the end of the day, but occasionally Defendant did so. On June 6, 2018, Jeremiah had a fever while at daycare, and Defendant picked him up in the late afternoon. Other than Defendant and Jeremiah, the only other person in Defendant's home during the afternoon and evening of June 6, 2018 and the morning of June 7, 2018 was D.G., the three-year-old child of Defendant's girlfriend Ashley Chavez.

{4} Jeremiah continued to experience a fever the evening of the sixth and the morning of the seventh, and he vomited on Defendant. Defendant bathed Jeremiah to reduce his fever, but when D.G. woke up and began crying, Defendant placed Jeremiah on the living room sofa and went to check on D.G. When Defendant returned to the living room, Jeremiah appeared to be seizing. Defendant panicked

and took Jeremiah to a different room and attempted to perform CPR on him because he thought Jeremiah was not breathing.

{5}     Defendant called his friend, Angelica Lerma, who rushed over from her nearby apartment and checked on Jeremiah. Jeremiah was not seizing when Angelica looked at him, but he was unconscious and his arms were locked at his side. Angelica and Defendant called 911. First responders arrived approximately thirty minutes later. The first officer on the scene observed Defendant unsuccessfully attempting to waken Jeremiah. The assistant fire chief, who arrived soon after, observed Jeremiah in a "seizure state," and noted that he was unresponsive. Jeremiah was breathing adequately, and the fire chief did not observe any evidence of trauma on Jeremiah's body.

{6}     EMTs transferred Jeremiah by ambulance to the Lincoln County Medical Center (LCMC) in New Mexico. Jeremiah's pupils were fixed and dilated when he arrived at LCMC. He was evaluated by doctors at LCMC, who determined that he should be airlifted to the El Paso Children's Hospital (EPCH) in Texas. It took approximately five hours for Jeremiah to arrive at EPCH due to delays with the transport team. Abigail traveled with Jeremiah to EPCH in the helicopter, and Defendant drove to the hospital after picking up Ashley.

{7}     Soon after arriving at EPCH, Jeremiah underwent evaluation, including a CT scan. Doctors determined that Jeremiah was gravely ill and that his intracranial pressure was dangerously high. They scheduled a craniotomy to relieve the pressure and drain a hematoma from his brain, but as soon as the neurosurgeon opened Jeremiah's skull, the brain expanded outward, exceeding the skull cavity. Although Jeremiah survived the surgery, he showed no improvement in his previous symptoms and began showing evidence of compromised pituitary function. Doctors performed tests for brain activity and found none. Jeremiah was declared dead on June 10, 2018. An autopsy later determined that his death was the result of homicide caused by blunt force trauma.

{8}     Defendant was charged with one count of intentional child abuse resulting in death. At trial, the State and Defendant relied significantly on expert medical testimony. The State presented testimony from treating and non-treating physicians that Jeremiah's skull had been fractured in two places leading to catastrophic brain swelling. The experts testified that the swelling quickly led to loss of brain function and death. According to the State's experts, the injuries were the result of "high energy" impacts inflicted sometime between the evening of June 6, 2018 and the morning of June 7, 2018, about "an hour or two hours" before the 911 call when Jeremiah was in Defendant's sole custody. The State also presented non-medical

evidence that Defendant resisted his paternal relationship with Jeremiah and that he failed to call 911 right away after discovering that Jeremiah was seizing. Additionally, the State offered testimony that Defendant fled to Mexico after learning that doctors at EPCH believed Jeremiah's injuries were non-accidental in origin, returning after he learned police were looking for him, but doing so late at night, wearing sunglasses and a hat and without his phone in hand.

{9}    The defense offered a different interpretation of Jeremiah's injuries, presenting expert medical testimony that the swelling in Jeremiah's brain could have resulted from a slow "rebleed" of an earlier injury suffered when Jeremiah fell off a small slide at daycare. According to the defense, the subdural hematoma was caused by a "thrombosis of the venous sinus" (blood clot) that might have resulted from an earlier fracture occasioned by the slide fall, and the bleeding might have been reinitiated when Jeremiah struck his head on a porcelain sink at the daycare center the day before he fell gravely ill. The defense's experts also contested the State's timeline for development of the fatal injuries.

{10}    The jury found Defendant guilty of intentional child abuse resulting in death. He was sentenced to life imprisonment, and he timely appealed.

## II. DISCUSSION

### A. Sufficient Evidence Supported the Jury's Determination That Defendant Intentionally Inflicted the Injuries Causing Jeremiah's Death

{11} "In reviewing the sufficiency of evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. It is our role to determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198 (internal quotation marks and citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Baca*, 1997-NMSC-059, ¶ 14, 124 N.M. 333, 950 P.2d 776 (internal quotation marks and citation omitted). "[T]he [j]ury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517 (second alteration in original) (internal quotation marks and citation omitted).

{12} Defendant argues the State presented insufficient evidence to prove that he struck or shook Jeremiah, causing Jeremiah's death, because the State's medical evidence "lacks the specificity required for a conviction." To convict Defendant of

the crime of intentional child abuse resulting in death, the State was required to prove beyond a reasonable doubt that (1) Defendant "shook Jeremiah Nevarez, and/or struck his head against another object," (2) by doing so, Defendant "caused Jeremiah . . . to be placed in a situation that endangered the life or health of Jeremiah . . . and/or cruelly punished Jeremiah," (3) Defendant "acted intentionally," (4) Defendant's "conduct resulted in the death of Jeremiah," (5) "Jeremiah . . . was under the age of twelve," and (6) this "happened in New Mexico on or about June 7, 2018." To find Defendant acted "intentionally" required the jury to determine it was "[D]efendant's conscious objective to endanger or cruelly punish the child."

{13}     Defendant contends the evidence in this case was not sufficient to establish the elements of intentional child abuse beyond a reasonable doubt because the State's experts testified variously with respect to the certainty of their conclusions, using terms like "reasonable explanation" or "most reasonable explanation" or "consistent with" or "majority of causes ruled out, leaving trauma" or "reasonable degree of medical certainty." Defendant relies almost exclusively on *State v. Consaul*, 2014-NMSC-030, 332 P.3d 850, to support his position. According to Defendant, *Consaul* instructs that the medical testimony in this case fails to establish guilt beyond a reasonable doubt because it requires speculation from the jury to

enable a finding that Defendant struck or shook Jeremiah, causing his death. We disagree.

{14}     In *Consaul*, the defendant was charged with intentional and negligent child abuse causing great bodily harm to an infant. *Id.* ¶ 1. The defendant had admitted to swaddling the ten-week-old infant tightly and placing him face down in his crib on his pillow, after which the infant began to manifest symptoms of distress. *Id.* ¶¶ 7-8. The infant was rushed to the emergency room, where doctors initially believed he was suffering from septic shock or an infection but ruled these out after he failed to respond to treatment and began suffering seizures. *Id.* ¶¶ 8-10. Following a CT scan and an MRI, the infant's treating physician determined that he had experienced oxygen deprivation to the brain and brain swelling, producing a "severe neurological injury." *Id.* ¶ 10.

{15}     We reversed the defendant's conviction, concluding the medical testimony failed to establish the elements of intentional child abuse. *Id.* ¶¶ 2-3. The doctor who led the process of determining the mechanism of the infant's death testified that she had been "concerned about suffocation," that her experience indicated that "this *could* most definitely be a case of suffocation," and that when she first examined the infant "definitely the *possibility* of child abuse . . . entered [her] differential diagnosis." *Id.* ¶ 63. She testified that, after reviewing the infant's CT scan, her

"major *concern*" was that the injury was non-accidental, and that it was "*most likely a lack of oxygen*" that caused it. *Id.* ¶ 64. When asked by the trial court to explain which physical manifestation led her to believe the infant had been suffocated, the doctor replied that the infant's seizures were an indicator "as was the *lack of any other physical manifestations*," explaining that "often nothing . . . can be seen, nothing on the face, no bruises, no bleeding." *Id.*

{16}    We concluded that the expert testimony failed to establish the elements of intentional child abuse because "the doctors in [that] case testified in various ways, and with various degrees of conviction, that they suspected child abuse, . . . that they could not think of other explanations for [the infant's] injuries, or that child abuse was a likely cause." *Id.* ¶¶ 71-72. Because the state's case rested almost entirely on this testimony, we held that the state had failed to meet its burden. *Id.* ¶ 72. We stated:

> If . . . the prosecution is to rely solely on medical opinion, . . . [t]he medical testimony should establish for the factfinder, the trial court, and reviewing courts why the expert opinions are sufficient in themselves to establish guilt beyond a reasonable doubt. There must be assurances that the jury has before it sufficient evidence, considered as a whole and without passion or speculation, to enable it reasonably to find guilt beyond a reasonable doubt.

*Id.* ¶ 73.

{17} This case is distinguishable from *Consaul* because in this case (1) the State's expert medical testimony was more conclusive about the extent of the injuries and the force required to cause them and (2) the State's other inculpatory evidence was more corroborative of the manner of death.

{18} First, the injuries suffered by Jeremiah were more extensive and presented differently from the injuries suffered by the infant in *Consaul* and, consequently, the expert medical testimony in this case was more conclusive than the testimony presented there. Five experts testified for the State, including the pediatric radiologist who reviewed Jeremiah's CT scan before surgery, the ICU physician who treated Jeremiah, the forensic pathologist who oversaw Jeremiah's autopsy, the Chief Medical Examiner for the State, and a child abuse pediatrician who reviewed the records in Jeremiah's case. The State's experts agreed that Jeremiah died as a result of blunt force trauma to the brain inflicted in the hours before he was brought to the hospital. Unlike the expert in *Consaul*, who pointed to the absence of physical symptoms of suffocation on the infant, the experts here identified two separate fractures in Jeremiah's skull visible on imaging: a left parietal (side) fracture and a right occipital (base) fracture, which likely occurred around the same time. The force creating these fractures caused swelling and bleeding in Jeremiah's brain—also visible on imaging—creating a hematoma, which increased pressure in the skull and

caused the brain to shift at the midline from left to right, and then to move downward toward the brain stem. The State's experts testified that such downward movement can quickly lead to death. Additionally, the State's experts noted that Jeremiah had suffered two additional visible injuries that are "concerning" for child abuse: bruising on his buttocks and on his frenulum (the tissue connecting the upper lip to the gum).

{19} The medical expert testimony regarding the force required to cause Jeremiah's injuries was also more conclusive than the testimony presented in *Consaul*. While the infant in *Consaul* died as a result of oxygen deprivation, which might have resulted from any number of causes, in this case, the State's experts agreed that Jeremiah died as a result of blunt force trauma. Unlike the expert in *Consaul*, who could not clearly establish the amount or quantity of force used to suffocate the infant, 2014-NMSC-030, ¶ 65, here, the State's experts opined the level of force (or "energy") required to produce the injuries observed in Jeremiah when he presented at LCMC was great—requiring rapid acceleration into a hard object. The State's experts did more than say "that they could not rule out" striking or shaking or that striking or shaking was a possibility "among a range of possibilities." *See id.* ¶¶ 69-71. Instead, the experts testified that the "only reasonable explanation" was that there was a high energy injury to Jeremiah's brain hours before the CT scan; that Jeremiah

"definitely had a great deal of energy [going] into his brain"; that it was "highly unlikely" that the bleeding in Jeremiah's head was chronic; that Jeremiah's contact with a porcelain sink the day before he fell ill was "absolutely not" consistent with the injuries observed in Jeremiah; that to "a reasonable degree of medical certainty" Jeremiah's injuries were consistent with non-accidental trauma; and that the forces required to sustain the injuries were "such that the person inflicting them would know that they would be likely to cause harm."

{20}     Second, the State's additional inculpatory evidence was more corroborative of the mechanism of injury than that presented in *Consaul*. In *Consaul*, the only circumstantial evidence beyond the medical testimony was that the defendant may have changed his story during a police interrogation, and the defendant's admission to investigators that he was "frustrated" with the infant on the night he was injured. 2014-NMSC-030, ¶¶ 74-92. The evidence that the defendant changed his story was equivocal, required speculation from the jury, and relied upon multiple levels of hearsay. *Id.* ¶¶ 75-90. While the evidence that the defendant was frustrated was relevant and probative as to motive, we concluded that, without evidence of the existence of a criminal act, evidence of motive alone was insufficient to establish guilt. *Id.* ¶¶ 91-92.

{21} By contrast, in this case, expert medical testimony was corroborated by other evidence suggesting Defendant intentionally caused Jeremiah's death. The State's medical experts testified that Jeremiah's injuries were inflicted within hours of when he was seen by doctors and the State presented uncontested evidence that Defendant was the only adult present with Jeremiah in the hours before he fell ill. "[E]vidence that the defendant had the best opportunity to inflict the injury" may support a guilty verdict for child abuse resulting in death. *See State v. Wilson*, 2001-NMCA-032, ¶ 35, 130 N.M. 319, 24 P.3d 351 (internal quotation marks and citation omitted), *overruled on other grounds as recognized by State v. Montoya*, 2005-NMSC-078, ¶ 11, 137 N.M. 713, 114 P.3d 393; *see also State v. Sheldon*, 1990-NMCA-039, ¶¶ 7-10, 110 N.M. 28, 791 P.2d 479 (holding there was sufficient evidence of intentional abuse of a child resulting in death where, among other things, medical testimony established a specific time frame within which the defendant was alone with the child and the child's injuries indicated that "more force was exerted on the child than one would expect from a simple fall"); *State v. Pennington*, 1993-NMCA-037, ¶ 36, 115 N.M. 372, 851 P.2d 494 (holding that sufficient evidence supported guilt beyond a reasonable doubt where the child appeared to be "fine" in the morning prior to the defendant having exclusive custody of him, but the child was found unconscious and

not breathing by emergency medical technicians at the defendant's apartment later that afternoon).

{22} Additionally, the State presented evidence that Defendant initially sought to deny his relationship to Jeremiah and that, even after it was determined that Defendant was Jeremiah's parent, Defendant's visits with him were sporadic and irregular. Video evidence suggested that Jeremiah had often appeared wary of leaving daycare with Defendant, and testimony from Defendant's friend established that after observing Jeremiah in distress, Defendant failed to call 911 right away, choosing to call her first. *See generally State v. Telles*, 2019-NMCA-039, ¶ 23, 446 P.3d 1194 (stating that the defendant's failure to promptly call 911 could constitute evidence that he intended to hide evidence from the police).

{23} Finally, the State also presented evidence of Defendant's consciousness of guilt—specifically, that Defendant fled to Mexico soon after being informed that doctors suspected Jeremiah's injuries were non-accidental. The doctors indicated to Defendant that Jeremiah's injuries might be non-accidental on the evening of June 7, 2018. The following day, an officer from the New Mexico State Police arrived at the hospital and spoke with Defendant, asking him if he could meet with him that day. Defendant agreed to meet at the El Paso, Texas police station at 3:00 p.m.

{24} Defendant left the hospital with Ashley and while they were driving, Defendant received a phone call, told Ashley to pull over, and ran from the car. Defendant then fled to Juarez, Mexico to be with his brother. Ashley contacted Defendant and told him the police "were trying to point everything at him" and that they were looking for him. The next day, Defendant was arrested at the border. The State argued at trial that Defendant's flight to Mexico was evidence of consciousness of guilt, indicating that Defendant knew he had intentionally harmed Jeremiah.

{25} Defendant responds that this non-medical evidence was contested at trial and specifically argues that the State's evidence of Defendant's flight to Mexico "is not sufficient alone to support his conviction and does not actually bolster the medical opinion testimony." He further contends his behavior in leaving the hospital while Jeremiah was being treated and missing his meeting with law enforcement cannot provide evidentiary support for his conviction because "the State's attempt at transforming innocuous conduct into nefarious intent rests on speculation, which *Consaul* expressly prohibits." Defendant argues that because the "flight evidence is just as equivocal as the medical testimony," the State has not satisfied its burden. We are not persuaded.

{26} It was within the province of the jury to reject Defendant's version of the facts. *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Our task is to

determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Garcia*, 1992-NMSC-048, ¶ 26, 114 N.M. 269, 837 P.2d 862 (internal quotation marks and citation omitted). Because a rational juror could have found that Defendant fleeing to Mexico supported an inference of consciousness of guilt, the fact that Defendant offered a contrary interpretation is insufficient to reverse his conviction. *Rojo*, 1999-NMSC-001, ¶ 19. While it is true that evidence of flight need not be interpreted by the fact-finder as evidence of consciousness of guilt, we have long recognized that such evidence is relevant because it tends to do so. *State v. Trujillo*, 1981-NMSC-023, ¶ 31, 95 N.M. 535, 624 P.2d 44.

{27} In sum, we conclude that the medical expert testimony and the additional inculpatory evidence in this case provided "sufficient evidence, considered as a whole and without passion or speculation, to enable it reasonably to find guilt beyond a reasonable doubt." *Consaul*, 2014-NMSC-030, ¶ 73.

{28} We think it important to note that, at trial, Defendant successfully sought to constrain the expert medical testimony presented to the jury, while on appeal he argues that the testimony was legally insufficient. We take this opportunity to provide guidance to lower courts in tackling the challenge of balancing a defendant's

strategic interests in defending against a charge of intentional child abuse at trial against the guidance we set out in *Consaul*. In this case, Defendant argued repeatedly and successfully that the expert witnesses should be limited to stating the injuries were "consistent with," rather than caused by, a particular mechanism. The defense's position was that permitting the experts to testify as to a diagnosis and to identify a single, strictly inculpatory cause would impermissibly shift the burden of proof to Defendant, who would then have to either prove a different cause of the injuries or disprove the cause identified by the expert(s).

{29} Experts must be permitted to testify to the level of certainty warranted by the evidence. We therefore caution trial courts to avoid unduly restricting the testimony of medical experts, especially by precluding testimony explaining the process by which they used differential diagnosis to rule in or rule out diagnoses. It will be for the opposing party to attack the weight and sufficiency of the evidence through cross-examination and the introduction of competing expert evidence, if available. *State v. Duran*, 1994-NMSC-090, ¶ 9, 118 N.M. 303, 881 P.2d 48. When expert testimony is deemed under our Rules of Evidence to be competent evidence, it is not the role of the court to shield the jury from it; "excluding [such] evidence vitiates the most basic function of a jury to arbitrate the weight and credibility of evidence,

even expert opinion testimony." *State v. Alberico*, 1993-NMSC-047, ¶¶ 36-37, 116 N.M. 156, 861 P.2d 192.

**B.    Any Error Committed by the District Court in Ruling That the State Would Be Allowed to Introduce Defendant's Perjury Conviction in Rebuttal Was Harmless**

**1.    Standard of review**

{30}    We generally review the admission or exclusion of evidence for abuse of discretion, although we apply a de novo standard to any interpretation of law underlying the evidentiary ruling. *DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 13, 146 N.M. 453, 212 P.3d 341. The district court does not abuse its discretion unless its ruling may be characterized as "clearly untenable or not justified by reason." *State v. Sanchez*, 2020-NMSC-017, ¶ 21, 476 P.3d 889 (internal quotation marks and citation omitted). "[T]he complaining party on appeal must show the erroneous admission . . . of evidence was prejudicial in order to obtain a reversal." *Cumming v. Nielson's, Inc.*, 1988-NMCA-095, ¶ 28, 108 N.M. 198, 769 P.2d 732. This burden includes having to show a "high probability that the improper evidence may have influenced the factfinder." *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 2005-NMCA-051, ¶ 32, 137 N.M. 524, 113 P.3d 347 (internal quotation marks and citation omitted).

## 2.     Analysis

{31}     Defendant argues the district court abused its discretion because, prior to trial, the court improperly determined that if Defendant elicited testimony about his good parenting, he opened the door to the State introducing evidence of his perjury conviction. The perjury conviction resulted from Defendant's statements under oath at a hearing held in the instant matter in which Defendant falsely testified that he had not been served with the grand jury target letter notifying him of the child abuse charges. According to Defendant, the perjury conviction was inadmissible on rebuttal because it did not bear on the pertinent character trait: Defendant's parenting. Defendant argues the court abused its discretion a second time by relying upon the "law of the case" doctrine in ruling during trial that the pretrial order bound the court at trial. He contends that such reliance was improper because the doctrine applies only to appellate court decisions.

{32}     The State counters that the perjury evidence was relevant rebuttal evidence because it showed Defendant's consciousness of guilt and because it was "probative as to whether the character witnesses offered by Defendant at trial were reliable, or whether the testimony was a product of procured perjury or influence by Defendant." The State further argues that the court's midtrial ruling was not in error because the law of the case doctrine has not been limited to appellate rulings in New Mexico.

{33}  As a preliminary matter, we reject Defendant's contention that the district court erred when it appeared to apply the law of the case doctrine during trial in deciding that it would not revisit the court's pretrial order on the perjury evidence. Like issue preclusion, the law of the case doctrine "precludes relitigation of an issue" in a lawsuit. *Cordova v. Larsen*, 2004-NMCA-087, ¶ 10, 136 N.M. 87, 94 P.3d 830. However, the law of the case doctrine is not an inexorable command, and courts have flexibility in deciding whether to apply it. *State ex rel. King v. UU Bar Ranch Ltd. P'ship*, 2009-NMSC-010, ¶ 21, 145 N.M. 769, 205 P.3d 816. Specifically, "law-of-the-case doctrine provides for discretionary application, and more so than stare decisis, considers the justness of applying a particular rule to the parties." *Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 42, 125 N.M. 721, 965 P.2d 305. That is plainly what the district court did in this case.

{34}  At trial, Defendant sought to reopen the issue of the perjury conviction after the State had rested its case, arguing that the evidentiary ruling in the pretrial order was erroneous. The State objected to revisiting the pretrial order, arguing that it was the "law of the case" and changing the rules after the State had rested would be unfair. The district court agreed with the State and denied Defendant's motion to revisit the pretrial order, reasoning that while the court "might have agreed" with Defendant's argument, it would not grant Defendant's requested relief at that point

"out of concerns of fairness and out of application of law of the case." The court considered the parties' arguments, reviewed the submitted authorities, and balanced the equities in deciding that it would be unfair to revisit the pretrial order after the State had rested its case. There was no error in this. *See Trujillo*, 1998-NMSC-031, ¶ 42 (reasoning that the parties' reliance on an earlier determination of a question of law would make it unjust to adopt a new rule at a later stage of the litigation).

{35}    We turn next to the pretrial order itself. Generally, character evidence is not admissible to prove a defendant's conduct. Rule 11-404(A)(1) NMRA; *State v. Martinez*, 2008-NMSC-060, ¶ 23, 145 N.M. 220, 195 P.3d 1232 (observing that modern rules of evidence preclude propensity evidence "not because the evidence lack[s] logical relevance, but because of its substantial prejudicial effect"). However, there are exceptions. For example, such evidence may be admitted for a non-propensity purpose such as to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). Additionally, a criminal defendant "has always retained the time-honored right to offer evidence of his own good character in his defense." *Martinez*, 2008-NMSC-060, ¶ 24. Rule 11-404(A)(2)(a) provides that "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." Finally, evidence of character may be admitted as

impeachment evidence pursuant to Rule 11-608 NMRA. "Courts and commentators have observed that these uses of character evidence are often misunderstood in their own applications and are frequently confused with one another." *Martinez*, 2008-NMSC-060, ¶ 13. That appears to have happened in this case.

{36}  The district court's pretrial order first recognized Defendant's right to introduce evidence of his good character, "including defense witnesses testifying that they do not believe Defendant is someone who would ever hit a child or commit the crime of child abuse." The court then ruled that, should Defendant elicit such testimony, the State would be "allowed to *rebut it* with specific instances of conduct . . . includ[ing evidence] that Defendant previously used corporal punishment against another child and that he committed perjury in an attempt to get the instant charges dismissed." While this language suggested the court had applied Rule 11-404(A)(2) to the evidence at issue, the court instead cited to Rule 11-404(B)(2)(a), the rule governing character evidence introduced for a non-propensity purpose, and UJI 14-5003 NMRA, which permits the jury to draw an inference of consciousness of guilt from evidence that, prior to trial, the defendant made a "false or deliberately misleading statement concerning the charge upon which he is now being tried." *See* UJI 14-5003 ("If you find that before this trial the defendant made a false or deliberately misleading statement concerning the charge upon which he is now being

tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt . . . .”). Adding to the challenge of reviewing the order on appeal, the court also cited to *State v. Vialpando*, 1979-NMCA-083, ¶ 23, 93 N.M. 289, 599 P.2d 1086, for the assertion that “[w]e recognize the prevailing rule prohibiting introduction of evidence indicating a defendant’s prior criminal record, unless presented to *rebut* character evidence offered by the accused.” (Emphasis added.)

{37}     To the extent that the court relied upon Rule 11-404(A)(2) in determining that it would admit the perjury conviction as character evidence in rebuttal, this was error. Rule 11-404(A)(2) plainly provides that, when a defendant places a pertinent character trait at issue, the state’s *rebuttal evidence* is limited to evidence bearing on that trait—here, Defendant’s good parenting. *See also* 1 Kenneth S. Broun, *McCormick on Evidence*, § 191, at 1188 (8th ed. 2020) (stating that “once the defendant gives evidence of pertinent character traits to show that he [or she] is not guilty, [the] claimed possession of these traits—but only these traits—is open to rebuttal”); 3 Michael H. Graham, *Handbook of Federal Evidence*, § 404:3, at 27-30 (9th ed. 2020) (stating that, if the defendant offers proof of a pertinent character trait, “the prosecution may then offer evidence as to the same character trait by way of

rebuttal"). Defendant's perjury conviction was not probative as to whether he was a good parent and so was not admissible for this purpose.

{38}     However, we conclude there was no error in the court's determination—if so made—that the evidence would be admissible under Rule 11-404(B)(2) to show consciousness of guilt. According to the State, the perjury conviction tended to show consciousness of guilt by demonstrating that Defendant illegally attempted to avoid the grand jury indictment in this case. The district court's citations to Rule 11-404(B)(2) and UJI 14-5003 suggests this was the basis of the court's reasoning, notwithstanding the text of the order itself. We hold there was no abuse of discretion in such a determination. "Although not expressly listed in Rule 11-404(B)(2), it has long been recognized that consciousness of guilt has independent relevance and therefore constitutes a permissible use of other acts or wrongs under Rule 11-404(B)." *State v. Chavez*, 2024-NMSC-023, ¶ 31, 562 P.3d 521 (text only)[1] (citation omitted).

{39}     In any case, the error (if there was one) was harmless. *See State v. Leyba*, 2012-NMSC-037, ¶ 24, 289 P.3d 1215 (pointing out that evidentiary errors will not

[1]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

support reversal unless "there is a reasonable probability that misconduct contributed to the defendant's conviction" (text only) (citation omitted)). As the State observes, the evidence in this case was voluminous, largely medical in nature, and vigorously contested by the parties. It seems unlikely that evidence that Defendant was generally considered a gentle parent could have overcome the cumulative medical evidence pointing toward his guilt. Moreover, even though the order may have dissuaded Defendant from offering character evidence, the jury nonetheless heard unrebutted testimony from Angelica Lerma that Defendant was a "time-out dad," that she never saw him strike a child, that he was good with Jeremiah and other children, and that Angelica had no concerns about leaving her children with him. After this testimony was offered by the witness near the end of the State's cross-examination of Angelica about the events of June 7, 2018, the State unsuccessfully argued to the district court that it fell within the terms of the pretrial order and thereby opened the door to admission of the perjury conviction. The district court found that, while the testimony came "right up to the edge of character evidence," it was limited to Angelica's personal observations, and denied the State's motion. As a result of the admission of this testimony, any character evidence Defendant would have introduced on his good parenting would likely have echoed evidence the jury had already heard. Accordingly, while we agree that the pretrial evidentiary ruling

may have been in error, we conclude that it does not warrant reversal. *See Leyba*, 2012-NMSC-037, ¶ 24.

**C. The District Court Did Not Err in Admitting Statistical Evidence at Trial**

{40} Defendant's final argument is that the use of statistics by the State's experts was "[u]nduly [p]rejudicial and [u]nhelpful." Defendant identifies two examples of statistical testimony he deems prejudicial. Dr. Johansson testified the likelihood a child who falls a distance between three and five feet will incur serious damage is one in two million. Dr. Nienow testified based on 2020 CDC data that there was one child death out of 1.2 million visits to an emergency department for falls, and that considering data on child deaths from physical abuse, "you are 600 times more likely to die from physical abuse than you are from a short fall."

{41} "[I]f an evidentiary issue is preserved by objection, we review the district court's decision to admit or exclude evidence for an abuse of discretion, which means the decision was clearly against the logic and effect of the facts and

circumstances of the case." *State v. Bregar*, 2017-NMCA-028, ¶ 28, 390 P.3d 212 (internal quotation marks and citation omitted).[2]

{42} Defendant argues the State's statistical evidence "diverted the jury's attention from the relevant facts from the case at hand, . . . distort[ed] the jury's truth-seeking function, and usurp[ed] its role in weighing the evidence." Additionally, Defendant contends that, by allowing the jury to interpret the statistical evidence as meaning that Jeremiah was, for example, 600 times more likely to have died from abuse than a short fall, it effectively reduced the State's burden of proof.

{43} Defendant relies on *People v. Julian*, a California case rejecting the use of statistical evidence bearing on whether child sexual abuse victims are likely to be telling the truth. 34 Cal. App. 5th 878, 885-86 (Ct. App. 2019). Defendant cites no

---

[2]The State argues that Defendant failed to timely object to the introduction of statistical evidence and, by failing to brief the error under the plain error standard, has waived the argument. We agree with the State that Defendant failed to timely object to Dr. Johansson's testimony, but we note that, because Defendant objected to Dr. Nienow's testimony at trial, those issues were properly preserved. Accordingly, we would normally review the admission of Dr. Johansson's testimony under the plain error standard and the admission of Dr. Nienow's testimony under the less demanding abuse of discretion standard. *See Bregar*, 2017-NMCA-028, ¶ 28 (stating that preserved evidentiary errors are reviewed for abuse of discretion); *State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056 (stating that unpreserved evidentiary errors are reviewed for plain error). However, because we conclude that the admission of neither expert's testimony constituted an abuse of discretion, we do not reach the question of whether the trial court committed plain error in admitting Dr. Johansson's testimony. *See Bregar*, 2017-NMCA-028, ¶¶ 28-29.

New Mexico authority in support, so we assume none exists. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329. The State responds that, even if Defendant preserved his objection to the evidence, its admission was not error because the evidence was not used to bolster the credibility of any witness, as was the case in *Julian*.

{44} We agree with the State that *Julian* stands for the limited proposition that statistical evidence may not be used to bolster the credibility of a witness. In *Julian*, four minor children testified in a prosecution of the defendant for child sexual abuse. 34 Cal. App. 5th at 881. The State also introduced expert testimony on "child sexual abuse accommodation syndrome," which "dispels myths that people have about the reactions children have to sexual abuse." *Id.* at 882-83. As part of this testimony, the expert witness testified using statistical evidence purporting to demonstrate the rarity with which child sexual abuse victims fabricate stories of abuse. *Id.* at 883.

{45} The California Court of Appeals held that statistical evidence "is not admissible to prove that the complaining witness has in fact been sexually abused" and "[t]he expert is not allowed to give an opinion on whether a witness is telling the truth . . . ." *Id.* at 885 (internal quotation marks and citation omitted). Although there is language in *Julian* that suggests a broader interpretation of the court's holding, *id.* at 886, the specific issue before the court was whether the statistical

evidence presented at trial deprived the defendant of a fair trial by bolstering the credibility of the complaining witnesses, thereby usurping the role of the jury in determining credibility. *Id.*

{46} Here, by contrast, the statistical evidence at issue was not offered to bolster the credibility of any witness to the abuse, and *Julian* is therefore inapt. Indeed, Defendant's complaint about the statistical evidence in this case boils down to the argument that, by depicting in statistical measures the rarity *in general* of severe brain injuries resulting from short falls, the jury was misled into improperly believing that it was unlikely that *Jeremiah* could have been so injured. In other words, Defendant's concern is not about the statistics themselves but a jury's ability to understand statistical measures in general—a much broader attack on statistical evidence than was presented in *Julian*.

{47} Statistical evidence, like other expert evidence, is generally admissible, provided a proper foundation is laid. *See State v. Anderson*, 1994-NMSC-089, ¶¶ 57-59, 118 N.M. 284, 881 P.2d 29 (holding that questions about statistical accuracy go to the weight, not admissibility, of the evidence); *State v. Espinoza*, 2023-NMCA-012, ¶¶ 10-14, 525 P.3d 429 (concluding that statistical basis of probability evidence was reliable and therefore DNA evidence was admissible because foundational requirements had been met); *Gonzales v. N.M. Dep't of Health*, 2000-NMSC-029, ¶

30, 129 N.M. 586, 11 P.3d 550 (stating that "[s]tatistical evidence showing that a protected class is under-represented in a given employment situation may be used to [demonstrate] disparate impact"); *cf. State v. Yepez*, 2021-NMSC-010, ¶¶ 27, 31, 39-40, 483 P.3d 576 (affirming the district court's determination that probabilistic evidence concerning genetic propensity for violence failed to evince sufficient fit between the science and the facts of the case because the effect of the genetic marker was not sufficiently understood). *See generally* 1 Broun, *supra*, § 208, at 1395 (stating that "[w]ith the development and implementation of scientific survey methods, the courts are much more receptive to proof based on sample data"); *Gabaldon v. Erisa Mortgage Co.*, 1999-NMSC-039, ¶¶ 17-18, 128 N.M. 84, 990 P.2d 197 (considering evidence of statistical probability of injury in determining whether wave pools are inherently dangerous).

{48} In determining whether statistical evidence is admissible, we examine whether the expert offering the evidence is qualified, whether the evidence will assist the trier of fact, and whether the evidence has a reliable scientific or technical basis. Rule 11-702 NMRA; *Alberico*, 1993-NMSC-047, ¶¶ 43-45. Defendant does not challenge the evidence at issue on foundational grounds on appeal and failed to do so at trial. For example, he did not and does not contest the designation of Dr.

Johansson or Dr. Nienow as medical experts, nor their reliance upon the studies generating the statistics they testified to.

**{49}** It was therefore within the district court's discretion to determine whether the probative value of the evidence was outweighed by its prejudicial effect under Rule 11-403 NMRA. *Rojo*, 1999-NMSC-001, ¶ 48 (stating that "[d]etermining whether the prejudicial impact of evidence outweighs its probative value is left to the discretion of the trial court" (internal quotation marks and citation omitted)). The district court considered Defendant's argument at trial that the evidence was unduly prejudicial and determined that it was not. "In determining whether the trial court has abused its discretion in applying Rule 11-403, the appellate court considers the probative value of the evidence." *Id.* The statistical evidence at issue was plainly probative on the question of whether a short fall such as that taken by Jeremiah falling from the slide could have caused his injuries. It supported the medical experts' determination that Jeremiah's death could only have resulted from blunt force trauma and was therefore non-accidental.

**{50}** Nor was the evidence confusing or misleading. "Under Rule 11-403, evidence may be excluded if its probative value is substantially outweighed by . . . the potential for confusion of the issues, or the danger of misleading the jury." *Id.* Dr. Johannson's statistic provided a numerical depiction of what he had already

described in his narrative response as the extraordinary rarity of skull fractures resulting from short falls. Dr. Nienow's use of the "600 times more likely" statistic was similarly offered as a summation and clarification of her narrative testimony, which also included simple details on generating that statistic. Accordingly, the district court's decision to admit the evidence can hardly be said to have been "clearly against the logic and effect of the facts and circumstances of the case." *Bregar*, 2017-NMCA-028, ¶ 28 (internal quotation marks and citation omitted). Defendant's recourse in such circumstances was to challenge what "is properly left for the jury": the weight or interpretation of each of these statistical depictions at trial. *Duran*, 1994-NMSC-090, ¶ 14. There is no merit in Defendant's contention that the jury was unable to understand the statistical evidence and that the evidence should therefore have been excluded.

## III.   CONCLUSION

{51}   We conclude (1) the medical and non-medical evidence presented at trial was sufficient to support Defendant's conviction for intentional child abuse resulting in death, (2) any error committed by the district court in ruling that it would admit the perjury conviction as rebuttal evidence was harmless, and (3) the district court did not abuse its discretion in admitting statistical testimony by the State's medical

experts. We therefore affirm Defendant's conviction for intentional child abuse resulting in death.

{52}    **IT IS SO ORDERED.**

_____

**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

_____

**DAVID K. THOMSON, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**

_____

**C. SHANNON BACON, Justice**

_____

**JULIE J. VARGAS, Justice**